**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ARNOLD FRIEDMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>MERGE HEALTHCARE, INCORPORATED, MICHAEL W. FERRO, JR., JEFFERY A. SURGES, JUSTIN DEARBORN and STEVEN M. ORESKOVICH,<br><br>Defendants. | **Case No.:**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**<u>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

Plaintiff Arnold Friedman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Merge Healthcare Incorporated ("Merge Healthcare" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of the common stock of Merge Healthcare between August 1, 2012 and January 7, 2014, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Merge Healthcare and several of its current and former senior executives and directors under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered and conducts business in this District and the alleged misconduct was transacted in and emanated from this District.

4. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5. Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased the common stock of Merge Healthcare during the Class Period and has been damaged thereby.

6. Defendant Merge Healthcare is a Chicago, Illinois-based company that offers health stations, clinical trial software and other health data and analytics services designed to engage consumers in their personal health. The Company's common stock is listed on the NASDAQ, an efficient market, under the ticker symbol "MRGE." As of October 31, 2013, the Company had more than 94 million shares of its common stock outstanding.

7. Defendant Michael W. Ferro, Jr. ("Ferro") served as a director and as the Chairman of Merge Healthcare's Board of Directors from June 4, 2008 until his resignation on August 26, 2013.

8. Defendant Jeffery A. Surges ("Surges") served as a director and as Merge Healthcare's Chief Executive Officer ("CEO") from November 2010 until his resignation on August 5, 2013.

9. Defendant Justin C. Dearborn ("Dearborn"), who previously served as Merge Healthcare's CEO between June 2008 and November 2010 and as its Chief Financial Officer ("CFO") between July 2011 and May 2012, served during the Class Period first as Merge Healthcare's President (having assumed that role in November 2010), as a director (having been appointed in May 2012), and as the CEO of Merge DNA (having assumed that role in May 2012), until August 5, 2013 when he was appointed CEO of Merge Healthcare to replace defendant Surges. Defendant Dearborn also remained a director throughout the Class Period.

10. Defendant Steven M. Oreskovich ("Oreskovich") is, and was throughout the Class Period, Merge Healthcare's CFO and Treasurer, having assumed those roles in June 2008.

11. The defendants referenced above in ¶¶7-10 are referred to herein as the "Individual Defendants." Merge Healthcare and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

12. Defendant Merge Healthcare develops software solutions designed to enable hospitals, imaging centers, integrated delivery networks, and health information exchanges to create information exchanges within their environments and with other entities worldwide. The Company's customers include healthcare providers ranging in size from single provider practices to large health systems, to the sponsors of clinical trials and medical device manufacturers. By the end of fiscal 2012, the Company claimed that its products were licensed by more than 1,500 hospitals, 6,000 clinics and labs, 250 medical device manufacturers and by top pharmaceutical companies world-wide.

13. On November 9, 2010, Defendants held a press conference to announce the hiring of defendant Surges as CEO. During the earning conference, defendant Surges told investors, "we will be investing in sales and marketing to transform Merge Healthcare into a growth company that can dominate our space over the next 36 months." Defendant Surges added "I believe that the market is right, the timing is right for us to build [a] $1 billion company."

14. During 2011, Merge Healthcare's revenues increased by 65% from $140.3 million in 2010 to $232.4 million in 2011, and Defendants reported that they expected revenues to increase in 2012 further to $288 to $300 million.

15. Prior to the end of the Company's 1Q 2012 (ended March 2012), the Company's reporting units were Merge Healthcare and Merge eClinical.

16. On May 7, 2012, Merge Healthcare issued a press release announcing "the creation of two operating groups – Merge Healthcare and Merge DNA (Data & Analytics)," emphasizing that the change would "position the company for growth and ensure greater transparency, predictability and profitability." The Company's press release further explained

that "[t]his change in operations [was] being driven by [the Company's] clients' purchasing requirements for subscription-based pricing to align more closely with their long-term operating plans" and that the "two operating groups [were] designed to allow for better focus on [its] two primary end users: providers and consumers." Commenting on the new operational reporting structure, the release also stated in pertinent part as follows:

> Merge Healthcare, which today represents approximately 85% of our total revenue, will continue to be led by Jeff Surges. Merge Healthcare markets, sells and implements interoperability, imaging and clinical solutions to healthcare providers and is moving towards a subscription model for its solutions. Merge DNA will be led by Justin Dearborn and will focus on the emergence of consumerism in healthcare. Merge DNA, also employing a subscription model, will include consumer health stations, clinical trials software and other consumer-focused solutions. In addition, Steve Oreskovich will resume his former role as Chief Financial Officer of the company.
>
> "Increasing demand for subscription offerings was a significant trend that we witnessed, and responded to, in the first quarter of 2012," said Jeff Surges, CEO of Merge Healthcare. "This followed the introduction of our Honeycomb solution at the RSNA trade show in November, 2011. Additionally, in Q1, we had three clients purchase multiple solutions with a total minimum contract value in excess of $2 million on a subscription model, instead of a traditional perpetual software license arrangement. With a subscription pricing model, we will recognize significantly lower upfront revenue, but anticipate more revenue over the contract term. While we expect our revenue to grow year-over-year in 2012, the trend towards subscription pricing has changed our initial 2012 revenue and adjusted EBITDA expectations."
>
> * * *
>
> As a result of the short-term financial impact inherent in a subscription pricing model, as opposed to a traditional perpetual license model, we are withdrawing our financial guidance with respect to 2012 revenue and adjusted EBITDA that was provided in November 2011. We will provide additional metrics later this year that will provide better visibility into our business. We will provide financial guidance for 2013.

17. The Class Period starts on August 1, 2012. On July 31, 2012, after the close of trading, Merge Healthcare issued a press release announcing its financial results for the 2Q 2012, ended June 30, 2012, emphasizing in the caption of the release: "Merge Reports Second Quarter Sales Growth of 13% – Signs new clients under subscription model and is named #1 VNA in the world." For the quarter, Merge Healthcare reported net sales of $62.9 million, emphasizing that "[s]ubscription-based pricing arrangements in which software, hardware and professional services are recognized ratably over a number of years generated 15% of total revenue in the quarter." The Company also reported a "non-recurring backlog at quarter end" of $62.4 million. Commenting on the Company's financial results and the success of its new subscription-based business model, the release also emphasized that Merge Healthcare had "[s]igned multiple subscription-based contracts including an extension of [its] strategic partnership with one of the largest imaging practices in the country," and quoted defendant Surges, stating, in pertinent part, as follows:

> Our second quarter results reflect solid revenue growth even as we move to a new business model. With our premier client base, industry-leading solutions and expansion into new markets, we are well-positioned for continued success in 2012.

18. On the morning of August 1, 2012, before the opening of trading, Merge Healthcare also conducted an investor conference during which the Defendants made additional positive representations about the Company's business metrics and financial prospects.

19. The Company filed its quarterly financial report on Form 10-Q with the SEC on August 6, 2012 as well, which was executed and certified as to veracity under the Sarbanes Oxley Act of 2002 by defendants Surges and Oreskovich. The Form 10-Q stated that "[o]ur backlog of non-recurring revenue was approximately $28.3 million as of June 30, 2012," and

that "subscription revenue backlog as of June 30, 2012 was $34.1 million." As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of June 30, 2012, as required by Rule 13a-15 of the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of June 30, 2012, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

20. On September 6, 2012, Merge Healthcare announced that "its Board of Directors ha[d] retained Allen & Company LLC, a New York-based investment bank, to assist in exploring and evaluating a broad range of strategic alternatives, including, but not limited to, a sale of the Company or a business combination."

21. On October 31, 2012, after the close of trading, Merge Healthcare issued a press release announcing its financial results for the 3Q 2012, ended September 30, 2012, emphasizing in the caption of the release: "Merge Reports 2012 Subscription Backlog Up 62% – Delivers third quarter revenue of $61 million and announces 2013 guidance of pro forma revenue range of $265 - $275 million." For the quarter, Merge Healthcare reported net sales of $60.4 million, emphasizing that: "[s]ubscription-based pricing arrangements in which software, hardware and professional services are recognized ratably over a number of years generated 15.1% of total

revenue in the quarter and subscription backlog grew 62% since the prior year end." The release also explained that Merge Healthcare had "[e]stablished 2013 guidance of revenue in the range of $265 - $275 million with an adjusted EBITDA range of 22-24% and expected subscription backlog growth by the end of 2013 of at least $25 million." The Company also reported "[s]ubscription and non-recurring backlog at period end" of $71.4 million. Commenting on the Company's financial results and the success of eClinical in particular, the release also emphasized that "eClinical segment signed over 150 contracts in the quarter resulting in a greater than 100% growth in bookings," and quoted defendant Surges, stating, in pertinent part, as follows:

> Our third quarter results continue to demonstrate our transition to a subscription model with both new and existing clients. Additionally, we are providing annual guidance for 2013 on revenue, adjusted EBITDA and subscription backlog growth based on the progress we have made in 2012.

22. On the morning of November 1, 2012, before the opening of trading, Merge Healthcare conducted an investor conference during which the Defendants made additional positive representations about the Company's business metrics and financial prospects.

23. The Company also filed its quarterly financial report on Form 10-Q with the SEC on November 1, 2012, which was executed and certified as to veracity under the Sarbanes Oxley Act of 2002 by defendants Surges and Oreskovich. The Form 10-Q stated that the "Merge Healthcare backlog of non-recurring revenue was approximately $31.1 million as of September 30, 2012," and that "[i]n the third quarter of 2012, subscription revenue was approximately 15% of total net sales and subscription revenue backlog as of September 30, 2012 was $40.3 million." As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of September 30, 2012, as required by Rule 13a-15 of the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of September 30, 2012, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

24. On February 19, 2013, before the opening of trading, Merge Healthcare issued a press release announcing its financial results for the 4Q and fiscal 2013, ended December 31, 2012, emphasizing in the caption of the release: "Merge Reports Subscription Backlog Up 82% – Delivers fourth quarter sales of $65.1 million and reiterates 2013 guidance of sales range of $265 - $275 million." For the 4Q 2012 and fiscal 2012, respectively, Merge Healthcare reported net sales of $64.7 million and $25.215 million, emphasizing that "[s]ubscription-based pricing arrangements generated 13.5% of total sales in the quarter and subscription backlog grew 13% in the quarter and 82% for the year." The release also "[r]eiterat[ed] 2013 guidance of revenue in the range of $265 - $275 million with an adjusted EBITDA range of 22-24% and expected subscription backlog growth by the end of 2013 of at least $25 million." The release further emphasized that "eClinical signed over 190 contracts in the quarter driving year-over-year bookings growth of 79**%**." As to backlog at the end of the 4Q 2012, the release stated that "[s]ubscription and non-recurring backlog at period end" was $76.9 million, up from $56.2

million at the end of fiscal 2011. Addressing the previous announcement that Merge Healthcare had hired investment bankers to explore strategic alternatives, the release now explained that "'[a]fter careful evaluation, we have determined that the alternatives evaluated did not offer more value than our own strategic plan.'" Instead, the release quoted defendant Surges, emphasizing, in pertinent part, as follows:

> We will continue to build upon the proven success over the last few years and further leverage our portfolio of solutions into a more present and ready marketplace than ever before. In addition, we are reiterating annual guidance for 2013 on revenue, adjusted EBITDA and subscription backlog growth.

25. On the morning of February 19, 2013, before the opening of trading, Merge Healthcare also conducted an investor conference during which Defendants made additional positive representations about the Company's business metrics and financial prospects.

26. The Company filed its annual financial report on Form 10-K with the SEC on March 11, 2013, which was executed by each of the Individual Defendants, and included a certification required by the Sarbanes Oxley Act of 2002 signed by defendants Surges and Oreskovich. The Form 10-K stated that the "backlog of non-recurring revenue was approximately $31.2 million and $45.1 million as of December 31, 2012 and 2011, respectively," and that "[a]s of December 31, 2012 subscription revenue backlog was $45.6 million." As to the Company's "Controls and Procedures," the Form 10-K stated, in pertinent part, as follows:

> **a) Disclosure Controls and Procedures**
>
> Disclosure controls and procedures are controls and other procedures of a registrant designed to ensure that information required to be disclosed by the registrant in the reports that it files or submits under the Exchange Act is properly recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include processes to accumulate and evaluate relevant information and communicate such information to a registrant's

management, including its principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosures.

Our control system is designed to provide reasonable assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2012. Based on their evaluation as of December 31, 2012, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a−15(e) and 15d−15(e) under the Securities Exchange Act of 1934, as amended) were effective at the reasonable assurance level to ensure that the information required to be disclosed by us in this Annual Report on Form 10−K was (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and regulations and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

**b) Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external reporting purposes in accordance with GAAP.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2012, using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control - Integrated Framework. Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2012. The effectiveness of our internal control over financial reporting as of December 31, 2012 has been audited by BDO USA,

> LLP, an independent registered public accounting firm, as stated in its report which is included below.
>
> **c) Report of Independent Registered Public Accounting Firm**
>
> * * *
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.
>
> * * *
>
> In our opinion, Merge Healthcare Incorporated maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on the COSO criteria.

27. On April 30, 2013, Merge Healthcare announced that it had set a June 18, 2013 annual general shareholder meeting ("AGM") at which it would seek shareholder approval of a an amendment to the Merge Healthcare Incorporated 2005 Equity Incentive Plan in order "to increase the number of shares available for issuance under the equity incentive plan by an additional 2,000,000 shares," which Defendants explained were needed to permit Merge Healthcare to provide its senior executives with the "incentives" required to attract and retain them. Defendants explained that, but for the increase, the Company would be unable to issue

additional options to purchase common stock to its executives as the prior allotment had been fully utilized.

28. On April 30, 2013, Merge Healthcare issued a press release announcing its financial results for the 1Q 2013, ended March 31, 2013, emphasizing in the caption of the release: "Merge Reports Record First Quarter Sales – Successfully Refinances Existing Debt at Half the Interest Rate." For the quarter, Merge Healthcare reported net sales of $63.6 million, emphasizing that "[s]ubscription-based pricing arrangements generated 15% of total sales in the quarter and subscription backlog grew 16% in the quarter and 74% in the last year." The release also explained that Merge Healthcare had "[a]nnounced debt refinancing, which entailed replacing existing 11.75% Notes with a new senior secured credit facilities consisting of a six-year term loan of $255 million and a five-year revolving credit facility of up to $20 million at an initial rate of 6%." The Company also reported "[s]ubscription and non-recurring backlog at period end" of $76.5 million, up from $63.2 million at the end of 1Q 2012. Commenting on the Company's financial results, the release quoted defendant Surges, stating, in pertinent part, as follows:

> Our record first quarter results, combined with our successful debt refinancing, provides a solid start to the year, an immediate benefit to our bottom-line and confidence in our long-term financial health and stability. As health systems look beyond their electronic health record (EHR) implementations and to their next set of strategic priorities, including Meaningful Use Stage Two, we expect to see continued momentum and adoption of our enterprise imaging and subscription-based offerings.

29. On the morning of May 1, 2013, before the opening of trading, Merge Healthcare also conducted an investor conference during which Defendants made additional positive representations about the Company's business metrics and financial prospects.

30. The Company also filed its quarterly financial report on Form 10-Q with the SEC on May 1, 2013, which was executed and certified as to veracity under the Sarbanes Oxley Act of 2002 by defendants Surges and Oreskovich. Concerning backlog, the Form 10-Q stated, in pertinent part, as follows:

> Under perpetual license agreements, the software, hardware and professional services are considered to be sources of non-recurring revenue and related backlog. The fourth quarter is typically the strongest booking quarter for Merge, along with the rest of the healthcare IT industry, while in the first quarter customers focus on implementation of their purchased solutions. As a result, non-recurring backlog is expected to decline in the first quarter compared to the year-end balance. The first quarter of 2012 was an anomaly to this trend given that in 2011 and early 2012 Merge was in the process of building out its sales force. The backlog of nonrecurring revenue was $23.8 million and $32.8 million as of March 31, 2013 and 2012, respectively. We also generate revenue through subscription-based pricing arrangements in which the contract elements are payable by our customers over a number of years. Generally, these contracts will include a minimum image volume and/or dollar commitment. As such, revenue from these transactions is recognized ratably over an extended period of time. Subscription arrangements also include contracts structured with monthly payments (including leases), long-term clinical trials or renewable annual software contracts (with very high renewal rates). As of March 31, 2013 subscription revenue backlog was $52.8 million, compared to $30.4 million at March 31, 2012. This significant increase is the result of the continued success of our strategic plan to continue to move to the subscription model.

31. As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of March 31, 2013, as required by Rule 13a-15 of the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of March 31, 2013, our disclosure controls and

> procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

32. On May 20, 2013, the market first learned that on May 17th, Merge Healthcare's General Counsel and Corporate Secretary, Ann Mayberry-French, had suddenly and without explanation "resigned."

33. The Company held its AGM on June 18, 2013 and its shareholders approved the amendment to the Company's 2005 Equity Incentive Plan to increase the number of shares of Common Stock authorized for issuance thereunder by 2,000,000 to 18,500,000 shares.

34. On August 9, 2013, the market would first learn that on August 5, 2013, defendant Surges too had suddenly and without explanation "resigned" as Merge Healthcare's CEO.

35. That same day, the Company also reported its 2Q 2013 financial results for the period ended June 30, 2013. For the quarter, Merge Technology reported a 9% decline year-over-year in revenue to $57.2 million ***despite reporting an 82% increase in its subscription backlog from the 2Q 2012 period***. The Company's GAAP losses also ballooned to $0.30 per share from a loss of just $0.06 per share in 2Q 2012. On an adjusted basis, Merge Healthcare's $0.01 EPS profit fell $0.04 short of what Defendants had led the market to expect, and its revenue fell well short of the $65.5 million it had led the market to expect. Quoting defendant Dearborn, the press release also stated, in pertinent part, as follows:

> Merge's value proposition continues to be very strong in three distinct market areas: imaging and interoperability, cardiology, and clinical trials. Our spending, on bringing innovative solutions to market, has outpaced our end user markets' readiness for a variety of macro-economic reasons currently clouding hospital spend decision making. We saw a continued reluctance amongst large health systems to move forward with enterprise purchases. Unfortunately, this pause has overshadowed the fourth quarter in a row of very strong bookings and revenue growth from our clinical trials group.

36. Though Defendants expressly acknowledged in the release that the 2Q 2013 results were "very disappointing," the release further quoted defendant Ferro, stating, in pertinent part, as follows, in an attempt to avert an outright free-fall in the Company's stock price:

> Speaking on behalf of all of Merge's Directors, I want to apologize for the company's very disappointing second quarter results. We all strongly believe in the company, its products and its employees. Our new leaders, Justin Dearborn and Nancy Koenig, resurrected Merge five years ago, and they are the right team to get the company back on track. I, personally, plan to continue to invest in Merge, whether in response to opportunities in the market or otherwise.

37. Citing cost reductions made in the 2Q 2013, the release also warned that the Company would take a $1 million to $2 million restructuring charge in the 3Q 2013. However, the release continued to optimistically emphasize "[b]acklog for the quarter in the clinical trials segment, which is 100% subscription revenue based, grew from $35.5M at the end of the first quarter of 2013 to $45.7M at the end of the second quarter of 2013."

38. On the morning of August 9, 2013, before the opening of trading, Merge Healthcare also conducted an investor conference during which Defendants made additional positive representations about the Company's business and financial prospects.

39. The Company also filed its quarterly financial report on Form 10-Q with the SEC on August 9, 2013, which included a certification required by the Sarbanes Oxley Act of 2002

signed by defendants Dearborn and Oreskovich. Concerning backlog, the Form 10-Q stated, in pertinent part, that "[t]he backlog of non-recurring revenue was $24.9 million and $28.3 million as of June 30, 2013 and 2012, respectively," and that "[a]s of June 30, 2013 subscription revenue backlog was $61.9 million, compared to $34.1 million at June 30, 2012," stating that "[t]his significant increase is the result of our strategic plan to continue to move to a subscription model." Concerning the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of June 30, 2013, as required by Rule 13a-15 of the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of June 30, 2013, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

40. Despite Defendants' efforts to prevent a free-fall in the stock price, on this news, the price of Merge Healthcare stock plummeted more than $2 per share – more than 45% – on extremely unusually high trading volume of more than 8 million shares trading, more than seventeen times the average daily trading volume over the preceding ten trading days.

41. Thereafter, on August 26, 2013, the market would first learned that defendant Ferro too had suddenly and without explanation "resigned."

42. Then, on October 30, 2013, before the opening of trading, Merge Healthcare issued a press release announcing its financial results for the 3Q 2013, ended September 30, 2013, emphasizing in the caption of the release: "Merge generates record cash from business operations in quarter." For the quarter, Merge Healthcare reported net sales of $57.2 million, "[s]ubscription and non-recurring backlog at period end" of $91.9 million, and emphasized that "[s]ubscription backlog grew 73% since the third quarter of 2012, with growth in both Merge Healthcare and DNA segments." Commenting on the Company's financial results, the release quoted defendant Dearborn, stating, in pertinent part, as follows:

> Even though overall third quarter sales were down compared to the prior year, we made tangible progress. We realized a record-breaking quarter in cash collections, voluntarily repaid a portion of our debt, streamlined our business operations, grew our subscription-based backlog and implemented a company-wide strategy for ICD- 10 across all applicable solutions. Add the launch of the new iConnect® Network for MU Stage 2, our recent award for 'Best in Interoperability' by Frost & Sullivan and our leadership standings in MU for radiology and vendor neutral archiving (VNA) and we're very well positioned for 2014. Further, while the debt refinancing last quarter resulted in $24 million of one-time expenses and $20 million of cash expenditures, we are seeing the positive impacts this quarter with lower interest, which will continue to decrease as we make voluntary repayments.

43. On the morning of October 30, 2013, before the opening of trading, Merge Healthcare also conducted an investor conference during which Defendants made additional positive representations about the Company's business metrics and financial prospects.

44. The Company also filed its quarterly financial report on Form 10-Q with the SEC on November 4, 2013, which included a certification required by the Sarbanes Oxley Act of 2002 signed by defendants Dearborn and Oreskovich. The Form 10-Q stated that "[t]he backlog of nonrecurring revenue was $22.3 million and $31.1 million as of September 30, 2013 and 2012, respectively," that "[a]s of September 30, 2013 subscription revenue backlog was $69.5

million, compared to $40.3 million at September 30, 2012," emphasizing that "[t]his significant increase is the result of our strategic plan to continue to move to a subscription model." As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of September 30, 2013, as required by Rule 13a-15 of the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of September 30, 2013, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

45. The statements referenced above were each materially false and misleading when made as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them, as follows:

a) both the existence and value of millions of dollars of eClinical customer contracts had been falsified, and as a result, the Company's reported subscription backlog and its reported increase in backlog was false and overstated during the six quarters ended September 30, 2013;

b) the Company was experiencing a "continued reluctance amongst large health systems to move forward with enterprise purchases";

c) Merge Healthcare lacked effective internal controls and its disclosure controls were not effective and had not been designed to provide reasonable assurance regarding the reliability of financial reporting";

d) Merge Healthcare had a deficiency in its internal controls which resulted in the failure to properly log and verify customer contracts, the failure to appropriately calculate commissions, and the compensation of salesmen based on purported, and even falsified, contract signings rather than actual cash collections; and

e) as a result, Defendants lacked a reasonable basis for their positive statements about the Company and its business.

46. On January 8, 2014, before the opening of trading, Merge Healthcare suddenly announced that the existence and/or value of millions of dollars of customer contracts had been falsified for six quarters ending September 30, 2013, in what it characterized as a rogue employee's attempt to reach sales quotas and garner $250,000 in additional commissions. The Company disclosed that day that the former employee, who had worked in its eClinical business, ***had resigned in September 2013***. Merge Healthcare also conceded that the employee in question had expressly acknowledged that the contracts in question were not valid. The Company also disclosed that its internal investigation had quantified the value of the falsified contracts at approximately $5.8 million and $9.4 million in 2012 and 2013, respectively, stating that those amounts had previously been included in Merge Healthcare's previously reported subscription backlog total during those years. As a result, the Company stated it was forced to reduce "its previously-announced non-GAAP subscription backlog totals for the Merge DNA segment for the quarterly periods ended June 30, 2012 through September 30, 2013, as follows:

*(amounts in thousands)*

| | June 30, 2012 | September 30, 2012 | December 31, 2012 | March 31, 2013 | June 30, 2013 | September 30, 2013 |
|---|---|---|---|---|---|---|
| Previously Announced DNA Subscription Backlog | $ 22,213 | $ 29,453 | $ 34,917 | $ 40,943 | $ 50,409 | $ 56,370 |
| Falsified Bookings in Quarter | $ 277 | $ 172 | $ 5,360 | $ 2,864 | $ 4,304 | $ 2,174 |
| Cumulative Falsified Bookings | $ 277 | $ 449 | $ 5,809 | $ 8,673 | $ 12,977 | $ 15,151 |
| Revised DNA Subscription Backlog at Quarter End | $ 21,936 | $ 29,004 | $ 29,108 | $ 32,270 | $ 37,432 | $ 41,219 |

47. Merge Healthcare also disclosed that day that it had made changes to its compensation plans for eClinical sales personnel to prevent further misconduct by changing from plans based on contract signings to a plan driven by invoicing and cash collections, and that it had remedied defects in its internal controls that had permitted the falsification of sales reports and strengthened its process for logging customer contracts and calculating commissions.

48. On this news, the price of Merge Healthcare stock, which had traded as high as $4.71 per share during the Class Period (on July 24, 2013), fell even further, closing at $2.31 per share on January 8, 2014. ***In the end, more than $225 million in market capitalization simply vanished from the stock's Class Period high***.

49. The market for Merge Healthcare common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Merge Healthcare common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Merge Healthcare common stock relying upon the integrity of the market price of Merge Healthcare common stock and market information relating to Merge Healthcare, and have been damaged thereby.

50. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Merge Healthcare common stock, by publicly issuing false and

misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

51. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Merge Healthcare's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Merge Healthcare and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Merge Healthcare common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Merge Healthcare common stock was removed and the price of Merge Healthcare common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Merge securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the

Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

53. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Merge securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Merge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

55. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Merge;

- whether the Individual Defendants caused Merge to issue false and misleading financial statements during the Class Period;
- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Merge securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

58. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Merge securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Merge securities between the time the defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

59. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

60. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

61. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

Merge securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Merge securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

64. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Merge securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Merge' finances and business prospects.

65. By virtue of their positions at Merge, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

66. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Merge securities from their personal portfolios.

67. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Merge, the Individual Defendants had knowledge of the details of Merge' internal affairs.

68. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Merge. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Merge' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Merge securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Merge' business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Merge securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

69. During the Class Period, Merge securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Merge securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise

acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Merge securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Merge securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

72. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73. During the Class Period, the Individual Defendants participated in the operation and management of Merge, and conducted and participated, directly and indirectly, in the conduct of Merge's business affairs. Because of their senior positions, they knew the adverse non-public information about Merge's misstatement of income and expenses and false financial statements.

74. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Merge's financial condition and results of operations, and to correct promptly any public statements issued by Merge which had become materially false or misleading.

75. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Merge disseminated in the marketplace during the Class Period concerning Merge's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Merge to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Merge within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Merge securities.

76. Each of the Individual Defendants, therefore, acted as a controlling person of Merge. By reason of their senior management positions and/or being directors of Merge, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Merge to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Merge and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Merge.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 26, 2014

**POMERANTZ LLP**

Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1. I, Arnold Friedman, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Merge Healthcare Incorporated ("Merge" or the "Company") and, authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3. I did not purchase or acquire Merge securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Merge securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Merge securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed 2/25/14
(Date)

(Signature)

ARNOLD C FRIEDMAN
(Type or Print Name)

MERGE HEALTHCARE, INC. (MRGE) FRIEDMAN, ARNOLD

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 8/15/2012 | PUR | 3,000 | $3.01 |
| 9/13/2012 | PUR | 2,000 | $3.37 |
| 9/24/2012 | PUR | 1,000 | $3.93 |
| 9/6/2013 | PUR | 6,400 | $2.65 |